[No. 8162.]

HENWOOD v. THE PEOPLE.

1. CRIMINAL LAW—*Plea of Autrefois Acquit—Former Jeopardy.* Defendant was accused, in separate informations, of the murder of one Copeland and one Von Phul, different individuals, and was confined without bail under each of the informations. A trial for the murder of Copeland resulted in a conviction, which, on error brought was reversed. Defendant upon his own motion, under Rev. Stat. § 2926 was discharged of the imprisonment under the information for the murder of Von Phul, and thereupon pleaded this discharge to the other information, alleging that all the shots fired by him were directed against Von Phul alone, and constituted one transaction. *Held* that even if the killing of both Von Phul and Copeland were to be regarded as a single transaction the effect of the discharge of the defendant from the former information was in no sense a trial upon the merits; that as to that information it did not appear that the accused was ever in jeopardy; that it was not the purpose of the statute to enable the guilty to escape, but to give effect to the provision of the Bill of Rights which guarantees to every accused person a speedy trial; that the statute is to be construed and applied in the light of the particular

facts presented; that upon defendant's own theory that the killing of Von Phul and the killing of Copeland were one act, the prosecution for the murder of Copeland was in strict conformity with the statute, therefore his discharge of the accusation in respect of Von Phul has not the effect to bar the prosecution for the other homicide. (551, 552)

2. ——*Continuance—Diligence.* The prisoner on May 8th was allowed a continuance to May 26th, in order to afford time to take the gree, it is the exclusive province of the jury to determine the question deposition of a witness named residing without the state, or ascertain the whereabouts of others named, and secure their presence at the trial. The cause being set or called for trial, the defendant applied for a commission for the examination of one of the witnesses named in the former application. *Held* properly denied as not made in apt time (552)

Whether the deposition of a non-resident witness may be taken in a criminal cause, *Quaere.* (552)

3. ——*Examination of Juror on Voir Dire.* Defendant's counsel had been permitted to examine a member of the jury by hypothetical questions, involving the defense of the accused. *Held* that the prisoner could not complain of questions afterwards propounded by the district attorney, in line with those of his own counsel. (553)

4. ——*Homicide—Self Defense.* It may be said in a general way that one is entitled to act on appearances, in using a deadly weapon to defend himself; but the appearances must be such as, taking into consideration the circumstances, at the particular instant, would have caused a reasonable and prudent man to use such weapon for his protection. (572)

5. ——*Office of Jury.* Where there is in the record sufficient evidence of all the facts necessary to constitute murder in the first deof guilt or innocence, the degree of the crime, and the manner of punishment, and it is not within the authority of the court to say that the verdict should have been other or different. (573)

6. ——*District Attorney—His Duty,* defined and enlarged upon, and particularly his duty to repudiate everything that savors of chicanery, and all appeals to unworthy prejudice, and see that no conviction shall take place except in strict conformity with the law. (559)

There was testimony tending to establish improper relations between the prisoner and the woman in the case; also testimony tending to show that Von Phul was infatuated with the woman. The husband of the woman was a witness for the prisoner, and upon the conclusion of his testimony, in quitting the witness stand, stopped and shook hands with the prisoner. *Held* a proper matter of comment to the jury; but the District Attorney having referred to another case in which

as he said the counsel for the prisoner had pursued the same tactics, and, as he claimed with success, the latter statement was held improper. (563, 564)

Argument to the jury that when the prisoner shot Von Phul, without justification and with deliberation and malice, and one of the bullets struck and caused the death of an innocent by-stander he was guilty of murder *held* proper, there being evidence to establish the matters of fact relied upon in the argument. (567, 568)

Defendant pleading self-defense the District Attorney commenting upon the instructions of the court that "great bodily harm", meant "a serious and severe injury", argued that the danger to be apprehended from Von Phul was not so imminent as to require the taking of his life, so that the accused was not entitled to plead self-defense. *Held* legitimate. (568, 569)

The District Attorney urged the jury to find the accused guilty of murder in the first degree and prescribe in their verdict the penalty of death, arguing that if men like the accused could go out and wreck homes, and thereafter shoot in the back men of whom they were jealous, and shoot indiscriminately into a crowd, and then be turned loose, there would be no safety for law-abiding citizens; and that there would be no necessity for courts or juries unless in such case, an example was set. *Held* there being testimony to support all the matters of fact so urged upon the jury, the argument was no more than an appeal to them to discharge their duty. (569)

The coat worn by Von Phul at the time of the shooting was in evidence and it was claimed by the prisoner that a hole in it corroborated the testimony of the prisoner that he shot in self-defense. One of the attorneys for the prisoner had had the coat in his possession,—always in the presence of others. The District Attorney argued that what was claimed to be a bullet-hole was in fact a knife-cut, and insinuated that defendant's counsel could have made it. This being assigned for error *held* it was for the jury to determine how the hole was made, its appearance was a proper matter of combat, and it was not improper to call the attention of the jury to the question. (570)

In view of the fact that counsel for the prisoner were, throughout the trial, vigilant to protect his rights, and that the court repeatedly admonished the jury not to accept as evidence the opening statement or the arguments of counsel it was concluded that in determining the guilt or innocence of the prisoner the testimony alone was considered. (571)

7.  ——*Evidence—Examination of Witness*, as to his occupation and antecedents is proper, as bearing upon the credit to be accorded to his testimony. (561)

8.  ——*Former Testimony of Witness Beyond the Jurisdiction of the Court.*—To receive in behalf of this state, at the second trial the recorded testimony of a witness at the first, who has gone and remains

beyond the jurisdiction of the court, is not a violation of the constitutional provision entitling the accused to meet the witnesses against him face to face. (554, 557)

The evidence of the absence of the witness held sufficient. (558)

9. ——*Opening Statement of Prosecutor.*—The purpose thereof is to give to the jury an understanding of the case from the viewpoint of counsel. The statement should not .be in the nature of an argument, and the District Attorney should be careful not to include statements relative to testimony not competent to *prove* any issue. in the case. (553)

10. WRIT OF ERROR—*Harmless Error.* It seems that error to the prejudice of the accused in the examination of a juror on the *voir dire* is harmless when the juror is not finally accepted upon the panel. (553)

Improper statements of the prosecuting officer in his opening statement to which objection is promptly sustained by the trial court cannot be assigned as error. (553·)

An assertion by the District Attorney that the report of the testimony of a witness at a former trial had been falsified having been fully explained, and the District Attorney shown to be in error, could not have influenced the jury and is not assignable as error. (561)

At the conclusion of the examination of one Garver for the defense, the District Attorney, speaking in a low tone asked leave of the court to file an information for prejury against this witness. None of the jury heard this application, though the fact was published in the newspapers of the city. About the same time the District Attorney, in a published interview, stated, in effect, that he understood women of the under-world would be called to bolster up the defense. That he would not stand for the repetition of what had occurred in a former case which he mentioned. No claim was made that by reason of either of these publications any witness who the prisoner desired to call had refused to testify, or left the jurisdiction. Conceding that the District Attorney acted improperly in making the statement attributed to him, and that the filing of the information against Garver should not have been published, *held* that in the absence of any showing that the accused had been prejudiced the matter could not be assigned for error. (561, 562)

*Held* further that the statement of the District Attorney, manifestly referring only to witnesses who should testify falsely could not have had the effect to terrify an honest witness. But the court add that the place to try any action is the forum which the law has provided, and not in the public press. Remarks made by the District Attorney to the jury, objection to which is promptly sustained are not prejudicial. (562)

An angry wrangle by counsel touching a mere question of law, is not prejudicial to the accused. (560)

11. VERDICT—*Comments of the Trial Judge*—That the accused "ought not to suffer the penalty of death" *held* not a disapproval of the finding of guilty of murder in the first degree. (574)

12. CONSTITUTIONAL LAW—*Summoning Jury.*—*Chapter 159 of the Acts of 1911*, providing for appointment of a jury commission in every county having a population exceeding one hundred thousand, according to the last census, state or federal, is not local or special and in no manner contravenes the constitutional provision against special laws. (552)

*Error to Denver District Court.*—Hon. CHAS. C. BUTLER, Judge.

Mr. JOHN T. BOTTOM and Mr. HARRY L. LUBERS, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, Mr. FRANK C. WEST, Assistant Attorney General, Mr. JOHN A. RUSH, District Attorney, Mr. CHARLES T. MALONEY, Deputy District Attorney, for the people.

Mr. JUSTICE GABBERT delivered the opinion of the court:

May 24th, 1911, plaintiff in error, whom we shall hereafter designate as defendant, shot and killed Sylvester L. Von Phul. For this homicide an information was filed May 31, 1911, charging him with murder. George E. Copeland, a bystander, taking no part whatever in the difficulty between the defendant and Von Phul, was struck and killed by some of the shots fired by defendant at Von Phul, and June 1, 1911, an information was filed charging defendant with the murder of Copeland. Defendant was arrested, committed without bail, and arraigned under both of these informations, and pleaded not guilty. For the killing of Copeland he was tried and found guilty of murder in the second degree, and sentenced to the penitentiary for life. He brought that case here for review and the judgment was re-

versed, and the cause remanded for new trial. *Henwood v. People,* 54 Colorado 188.

A second trial of the case resulted in a conviction of murder in the first degree and sentence of death, and it is this judgment which is before us for review. The defendant was not brought to trial under the information charging him with the murder of Von Phul, and in February, 1913, and prior to the date the case charging him with the murder of Copeland was tried the second time, he filed a motion to be discharged in the Von Phul case, based upon the provisions of section 2926, Revised Statutes 1908, which are as follows:

"If any person shall be committed for any criminal or supposed criminal matter, and not admitted to bail, and shall not be tried on or before the expiration of the second term of the court having jurisdiction of the offense, the prisoner shall be set at liberty by the court, unless the delay shall have been on the application of the prisoner.   *   *   *,"

The motion was granted and the defendant set at liberty in that case. Thereafter defendant filed a plea of *autrefois acquit* in the Copeland case. On motion of the District Attorney certain portions were stricken. The defendant elected to stand on his plea as then presented. The District Attorney then demurred to the plea, upon the ground that it was not sufficient in law to preclude the people from prosecuting; that it did not show that defendant was acquitted of the crime of killing Von Phul, and shows that the killing of Copeland was a separate and distinct offense from the crime charged in the information charging him with the murder of Von Phul. The demurrer was sustained, and this ruling is assigned as error.

The plea was to the effect that the killing of Von Phul and the killing of Copeland constitute one and the same offense, on the theory that all the shots fired by defendant were fired at Von Phul, with the intention that they should strike him and none other, and that setting him at liberty in the Von Phul case was equivalent to an

acquittal in that case, and hence barred a prosecution of the offense as charged in the Copeland case. Generally speaking, the plea of *autrefois acquit* is a plea by the defendant that he had been formerly tried and acquitted of the same offense charged in the information to which the plea is made. Such a plea when sufficient and established is upheld by virtue of the provisions of our bill of rights, and the principle of the common law to the effect, that a person shall not be twice put in jeopardy for the same offense. Conceding, but not deciding, that the plea alleged facts from which it appears the crimes charged in the two informations constitute one and the same offense, we will consider the contention on behalf of defendant, that setting him at liberty in the Von Phul case was equivalent to an acquittal by a jury, or barred a prosecution for the murder of Von Phul, and was therefore a bar to the prosecution for the murder of Copeland. The proceeding setting the defendant at liberty in the Von Phul case was in no sense a trial on the merits; neither does it appear therefrom, that he has been placed in jeopardy in that case. It was not the purpose of our statute to enable the guilty to escape, but to prevent unnecessary delays on the part of the prosecution, so that the utmost which can be claimed for the statute, generally speaking, is that it was thereby intended to give effect to that provision of our bill of rights which guarantees one accused of a criminal offense a speedy trial, and therefore, when one charged with a crime brings himself within its provisions, he is entitled to be set at liberty, and cannot afterwards be committed or held for the same offense, when charged therewith in a second indictment or information.

The statute however, must be construed and applied in the light of the particular facts presented, when the effect of setting one at liberty under its provisions is involved, so that his rights thereunder will be fully preserved, and not result in the miscarriage of justice. Turning to the plea we find it is there alleged; that on May 31, 1911, an information was filed charging defend-

ant with the murder of Von Phul; that to this information he pleaded, not guilty, and the case was set for trial June 19, 1911; that June 1, 1911, an information was filed charging him with the murder of Copeland, to which he pleaded, not guilty, and the cause was set for trial June 19, 1911; that this latter cause was tried with the result that defendant was convicted of murder in the second degree; that he sued out a writ of error to the Supreme Court, and in due course the judgment was reversed and the cause remanded for a new trial, and that thereafter the defendant was set at liberty under the information charging him with the murder of Von Phul, by virtue of section 2926, Revised Statutes 1908, as above noted. Facts are then alleged which it is claimed established that the offenses charged in the two informations constitute one and the same crime. It thus appears, adopting the theory of the plea, that thereby it is shown the defendant was charged in the two informations with the same offense, that he was brought to trial and prosecuted therefor in the Copeland case within the time fixed by the statute. In such circumstances he has been prosecuted in strict conformity to the statute, according to his own theory, for the murder of Von Phul, by the prosecution of the Copeland case, and hence, setting him at liberty in the Von Phul case cannot and does not operate to bar the prosecution of the information charging him with the murder of Copeland. In our opinion the ruling of the trial court in sustaining the demurrer to the plea is correct. In passing upon this question it must be borne in mind we have not decided, that from the plea it appears the informations constitute one and the same offense, or that by setting him at liberty in the Von Phul case he could not be prosecuted for the offense charged in that case under a second information for the same offense, but assuming that the contention of his counsel in this respect is correct, and also assuming that they are correct in their claim that by the plea it appears the informations charge the same crime, we base our conclusion that setting him at liberty in the

Von Phul case did not operate to prevent the prosecution of the case at bar, for the reason, it appears from his plea that he has been diligently prosecuted as the statute requires for the offense with which he was charged, by the information in the Von Phul case, and therefore the statute is not applicable to the facts presented by the plea or the question sought to be raised thereby.

Subsequently to overruling his plea, the defendant applied to the court for a commission to take the deposition of a witness in his behalf, which was denied. This ruling is assigned as error. The witness resided without the state. It appears that on May 8, 1913, the defendant applied for a continuance of the case to May 26, 1913, in order to have time to take the deposition of a witness named, or ascertain the whereabouts of others named in the application, and have them personally present at the trial. The application for continuance was granted. On May 28, the day the cause was set or called for trial, the defendant applied to the court for a commission to take the deposition of one of the witnesses named in the application, and it is the ruling denying this application of which complaint is made. Without expressing any opinion on the right of a defendant in a criminal action to take the deposition of a witness without the state, we think the ruling was right upon the ground that the application was not made in apt time.

The defendant moved to quash the jury panel, because the members were selected and summoned by the jury commissioner under the act of 1911. The motion was denied. It is claimed the act is local and special, and contravenes the constitutional provisions inhibiting special laws. In our opinion neither this objection nor any others urged in support of the motion are tenable.

Error is assigned on questions by the District Attorney in his examination of a juror. The prime purpose of the examination of a juror on his *voir dire* is to ascertain whether if selected he will be fair and impartial and render a verdict according to the evidence and the law, guided by the instructions of the court. For

this purpose considerable latitude must be allowed counsel, and perhaps to a limited extent hypothetical questions are proper. It is this class of questions propounded by the District Attorney of which counsel for defendant complain. Over the objection of the District Attorney counsel for defendant had been permitted to propound questions to the juror of a similar import, which embraced the theory of the defense, and the questions of the District Attorney complained of were propounded afterward with the object of eliciting more fully the views of the juror as expressed in response to the hypothetical questions of counsel for defendant. In such circumstances the defense cannot successfully complain of questions by the District Attorney which were in line with those propounded by them. We think some of the facts assumed by the District Attorney were not proper, and that testimony to establish them would not be admissible, but it is clear that the court, in ruling upon the hypothetical questions, advised the juror that the hypothetical case could not be considered as evidence, so that embracing incompetent matters in such question could not have prejudiced the defendant. In addition, it appears the juror did not finally sit in the case.

Complaint is next made of the opening statement of the District Attorney to the jury. The purpose of an opening statement is to acquaint the jury with the nature of the case they have been selected to consider, advise them briefly regarding the testimony which it is expected will be introduced to establish the issues involved, and generally give them an understanding of the case from the viewpoint of counsel making the statement, so that they will be better able to comprehend the case as the trial proceeds. Such statement should not be argumentative, and the District Attorney should always be careful not to include statements relative to testimony not competent to prove any issue in the case. The statement under consideration did embrace matters which were not relevant, but it appears that all objections by counsel for defendant as the statement pro-

gressed were promptly sustained by the court, so that by the vigilance of his counsel and the rulings of the court the defendant was not prejudiced by any remarks of the District Attorney in making the opening statement for the prosecution.

As further protecting the rights of the defendant, we call attention to the fact that the court in instructing the jury said: "These instructions contain the law which will govern you in this case and in determining the facts you are to consider only the evidence given upon the trial. The *opening statements and the arguments of counsel are not evidence.*"

On behalf of the prosecution the testimony of two witnesses who appeared and testified at the former trial was read from the stenographic notes. So far as advised from the record it does not appear that any objection was made by the defendant to the introduction of the testimony in this form; but waiving this, we will consider the argument of counsel to the effect that by permitting the testimony to be read the rights of the defendant as guaranteed by section 16 of article 2 of the constitution, that the accused is entitled "to meet the witnesses against him face to face," were violated. As we understand the briefs, the testimony was permitted to be read to the jury for the reason it appeared that the witnesses who gave it at the former trial were absent from the state and beyond the jurisdiction of the court. The decisions of the different states are not in harmony on the question of whether such testimony is admissible against the accused in such circumstances. In this jurisdiction, in the case of *Young v. The People,* 54 Colo. 293, 130 Pac. 1011, that question was under consideration, and it was there determined that when it appears that witnesses who testified at a former trial of the case on the part of the prosecution are beyond the jurisdiction of the court, their testimony so previously given is admissible at a second trial and may be read to the jury.

Greenleaf, in his work on evidence, section 163, states the rule to be that the testimony of a witness be-

yond the jurisdiction of the court, given in a former action, is competent evidence in a subsequent action between the same parties, involving the same issues. The reason for the rule is that it comes up to one of the demands of the law in such circumstances in that it is the best evidence which can be produced. *United States v. Macomb*, 5 McLean, 286 Fed. Cas. No. 15702. When a defendant in a criminal action has had the opportunity to face a witness testifying on the part of the prosecution in the trial of the case on its merits and cross-examine him, as in the case at bar, the great and ordinary test of the truth of his statements is no longer wanting, and admitting the testimony so given at a retrial of the case does not violate any of the defendants' rights. In *Mattox v. United States*, 178 U. S. 458, 44 L. Ed. 1150, 20 Sup. Ct. 993, cited by counsel for defendant, it was held that the testimony of a witness for the government given at a preliminary trial of the defendants was not admissible. From a perusal of the opinion it appears that the real basis of this conclusion was that the absence of the witness was the fault of the prosecution. Speaking on this subject it was said:

"It did not appear that Taylor (the witness) was absent from the trial by the suggestion, procurement or action of the accused. On the contrary, his absence was manifestly due to the negligence of the officers of the government. Taylor was a witness for the prosecution. He had been committed to jail without bail. We have seen that the official agent of the United States, in violation of law, took him from jail after the trial of this case commenced and strangely enough placed him in charge, not of an officer, but of another witness for the government, with instructions to the latter to allow him to stay at a hotel at night with his family. And on the very day when Taylor was called as a witness, and within an hour of being called, he was in the corridor of the court house. When called to testify he did not appear. * * * In the present case there was not the slightest ground in the evidence to suppose that Taylor had absented himself from the

trial at the instance, by the procurement or with the assent of either of the accused. Nor (if that were material) did his disappearance occur so long prior to his being called as a witness as to justify the conclusion that he had gone out of the state and was permanently beyond the jurisdiction of the court. His absence, as already said, was plainly to be attributed to the negligence of the prosecution."

In *Mattox v. United States,* 156 U. S. 237, 39 L. Ed. 409, 15 Sup. Ct. 337, it was held that when a person accused of a crime is tried and convicted and the conviction is set aside and a new trial ordered, a properly verified copy of the reporter's stenographic notes of the testimony of a witness for the government at the former trial, who was then fully examined and cross-examined and who died after the first trial and before the second, is admissible in evidence against the accused at the second trial. In that case it was claimed on behalf of the accused that admitting the testimony referred to infringed his constitutional right to be confronted with the witness against him. The court, after calling attention to the fact that in some states it had been held that such testimony was not admissible over the objection of the accused, said:

"Upon the other hand, the authority in favor of the admissibility of such testimony, where the defendant was present either at the examination of the deceased witness before a committing magistrate or upon former trial of the same case, is overwhelming."

Referring to the case of *United States v. Macomb, supra,* the court said:

"All the cases up to that time were cited in the opinion and the decision put upon the ground that the right of cross-examination having once been exercised, it was no hardship upon the defendant to allow the testimony of the deceased witness to be read. * * * The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits such as were sometimes admitted in civil cases being used against the

prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness, and that if notes of his testimony are permitted to be read he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficial in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused.   *   *   * The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face and of subjecting him to the ordeal of a cross-examination.''

If the testimony of a deceased witness given at a former trial of the case against the accused is admissible against him at a second trial of the same case, for the reasons above noticed we can see no reason why the testimony of a witness given at a former trial is not admissible against the accused at a second trial when such witness is beyond the jurisdiction of the court, because in that instance it is impossible for the prosecution to produce such witness in court by process. The trial court did not err in admitting the testimony.—*Vaughan*

v. State, 58 Ark. 353, 24 S. W. 885; Lett v. State, 124 Ala. 64, 27 South. 256; State v. Nelson, 68 Kan. 566, 75 Pac. 505, 1 Ann. Cas., 468.

Counsel for defendant call attention to the fact that in several states it has been held that the character of evidence under consideration is admissible because of statutory provisions on the subject. Such provisions could not deprive the accused of a constitutional right, hence can not be regarded as authority for the introduction of testimony which would not be admissible if violative of either federal or state constitutional guaranties.

It is next claimed that there was no positive or affirmative proof that the witnesses whose testimony was read to the jury as given at the former trial were out of the state or beyond the jurisdiction of the court. A witness on behalf of the prosecution was called who testified that each had left the state permanently, one going to Dakota and the other to California. In addition, it is asserted by counsel for the people in their brief, and not denied by defendant, that prior to the trial the people had subpoenas issued for these witnesses directed to the sheriff of each county in the state, and that the returns thereon disclosed that neither of the witnesses could be located within this jurisdiction.

We now come to a consideration of the errors assigned on the alleged misconduct of the District Attorney. It is to be regretted that questions of this character are so frequently called to our attention in criminal cases brought here for review from the District Court of the City and County of Denver, and that complaints on this score have extended over a number of years. In several instances we have had occasion to caution District Attorneys on this subject, and in some have been compelled to reverse convictions and order a new trial solely because of the misconduct of the District Attorney. There is no excuse for a District Attorney indulging in remarks or taking a course verging on misconduct. For as said in Ritchey v. The People,

23 Colo. 314, 41 Pac. 272, 384, by way of quotation from Wharton on Criminal Law, section 3003: "It is scarcely necessary to add that a prosecuting attorney is a sworn officer of the government, required not merely to execute justice but to preserve intact all the great sanctions of public law and liberty. No matter how guilty a defendant may in his opinion be, he is bound to see that no conviction shall take place except in strict conformity to law. It is the duty indeed, of all counsel to repudiate chicanery, and appeal to unworthy prejudice, in the discharge of their high office; but eminently is this the case with public officers elected as representing the people at large, and invested with the power which belongs to official rank, to comparative superiority in experience, and to the very presumption here spoken of, that they are independent officers of state." It is certainly the duty of a District Attorney to try a criminal action in such manner, in accordance with the rules of law as will result in presenting it fully and fairly to a jury, but he has no right, through misguided zeal to trespass on the verge of error, nor pursue a course which may result in a reversal of a judgment of conviction at the expense and detriment of the people. We mention these matters because of the frequency with which the alleged misconduct of the District Attorney is raised in criminal actions tried in the second judicial district (and not always without reason), and to urge upon these officials the necessity of refraining from conduct which can be made the basis of a charge of misconduct, and likewise to urge upon the District Court the necessity of putting a stop to such practices by the exercise of the power it possesses.

While not all together in the order in which questions called to our attention by counsel for defendant in error should be considered, we will pass upon the alleged misconduct on the part of the District Attorney in the trial of the cause and arguments to the jury. Many of these are of little moment, and were it not for the gravity of the case would not be mentioned. For in-

stance counsel for the defendant asserted that by the action of the court he had been acquitted in the Von Phul case. To this the District Attorney replied, he had not. A colloquy then occurred between counsel as to the effect of the order of the court in setting the defendant at liberty in the Von Phul case, during which strong language was used. Clearly nothing that was said by counsel on either side on the subject could have had any effect on the jury as the matter being discussed was one of law purely, and not of fact. In this connection we note the record shows that the District Attorney and leading counsel for defendant were guilty of conduct, at different times, which the court should not have tolerated, although not of a nature which could have had any effect upon the jury, except to cause them to regret that counsel engaged in the trial of a case involving life did not conduct themselves in a more proper and dignified manner.

Again when the defendant was on the stand and being cross-examined, the District Attorney appears to have had some controversy with him, which in a measure at least, was prompted by the answers of the defendant and his characterization of him as a prosecutor, but not of a nature which could have prejudiced the defendant in the eyes of the jury.

In cross-examining the defendant the District Attorney asked several questions, objections to which were sustained. Whether these rulings were right or wrong is not material as they related to trivial matters which could not have had any effect upon the case. The District Attorney however, insisted in repeating some of these questions. This was unbecoming on his part to say the least, and the court would have been justified in taking such steps as would have put a stop to such conduct; but as we have said these questions related to matters of such trivial moment that although the conduct of the District Attorney should have been severely censured it did not prejudice the defendant.

Other witnesses testifying for the defense were

asked questions on cross-examination, the purpose of which was to show their occupation and antecedents. We think this was proper in order to enable the jury to pass upon their credibility.

The foreman of the jury at the first trial was being questioned on the part of defendant with respect to the testimony of a witness given at that trial as to what he stated regarding the position of Von Phul when he was shot. The District Attorney charged defendant's counsel with falsifying the record of the previous trial as to such testimony. There does not appear to have been any basis for such a charge. In order to better understand the point being considered, we call attention to the fact that the matter being inquired about was whether Von Phul, at the time he was shot, was standing with his right arm or his right hand on his hip pocket. The stenographer at the former trial had written right arm, in taking the testimony of the witness who testified on the subject. Counsel for defendant contended this was a mistake, and in the previous bill of exceptions the extension of the notes of the stenographer had been corrected by counsel for defendant so as to read right hand instead of right arm, without objection on the part of the then District Attorney and was presented to the Supreme Court as thus corrected. The witness on the stand (the former juror), stated that at the former trial the testimony of the witness was right hand. It thus appears that the matter was fully explained to the jury, and that the assertion of the District Attorney, of which complaint was made, was of no moment, and could not have influenced the jury in the slightest degree.

One John T. Garver was called as a witness for the defendant. At the conclusion of his testimony the District Attorney demanded that he return at two o'clock. Later in the presence of the jury, he requested that the witness remain until excused, although counsel for defendant assert that the District Attorney said, "until released." The bill of exceptions signed by the trial judge states that the District Attorney said, "until ex-

cused,.'' and we must accept that as correct. Counsel for defendant, however, assert, as embodied in the motion for a new trial, that afterwards the District Attorney in the presence of the jury asked leave of court (though in a muffled tone) to file an information charging the witness with perjury. From the record it is clear that this action could not have influenced the jury. In opposition to the motion for a new trial an affidavit of each juror was presented, from which it appears that not a single member was aware that an information had been or was to be filed charging Garver with perjury. That an information had been filed against Garver was published in the Denver papers, and it is claimed that this may have terrorized the witness, as well as any other witness whom the defendant may have desired to call. About the same time the District Attorney in an interview published in a Denver paper stated in effect, that he understood that women of the under world would be put on the stand to bolster up the case of the defendant; that a number of new witnesses would be called; that if they were all right they had the right to testify, but that he would not stand for a repetition of the Gertrude Patterson case; that that case was a disgrace and he was going to see to it that there would be no perjured testimony.

It is claimed that this may also have terrorized or intimidated witnesses for the defendant. When these publications were called to the attention of the court, and before any statement was made respecting their nature, the jury was excused from the court room. No claim is made on the part of the defendant that either of the publications caused any witness whom he desired to call, to refuse to testify or leave the jurisdiction of the court. Conceding then, that the District Attorney should not have made the statement attributed to him in the published interview, and that the filing of an information against Garver should not have been published, we think it must affirmatively appear that defendant was prejudiced thereby, before such matters can be said to con-

stitute error, and in the absence of such showing that he was thus prejudiced, the claim made that he was, is purely speculative. Moreover, it is apparent from the statement published, that it only referred to witnesses testifying falsely. Such a statement could not have frightened an honest witness, and reduced to its final analysis amounted to nothing more than a statement by the District Attorney that he would perform his duty as. a prosecuting official. We call attention however, to the fact that the place to try an action is the forum which the law has provided and not in the public press.

Our attention is also directed to the fact that the District Attorney had criticized two of the peace officers of the City and County of Denver by stating to them he understood they were working for the defense, when as they were in the pay of the people they ought to be assisting the state. When this occurred we are not advised, but it is not claimed that this statement deterred either of these parties from testifying or giving the defendant such information as they might possess material to his defense, and it cannot therefore be said that the action of the District Attorney in criticizing them, prejudiced the defendant.

The theory of the prosecution was, that Von Phul and the defendant were infatuated with the woman in the case, and that the shooting of the former was prompted by the jealousy of the defendant. There was testimony tending to prove that improper relations existed between the woman and the defendant. The husband of the woman was a witness for the defendant, and testified that he had never observed anything verging on the improper between defendant and his wife. At the conclusion of his testimony on leaving the witness stand, he stopped and shook hands with the defendant. The assistant District Attorney in his opening argument to the jury referred to this incident as a trick. Whether it was intended to make an impression on the jury favorable to the defendant by exhibiting in their presence that friendly relations existed between the witness and the

defendant, was a proper matter for the prosecution to comment upon. Continuing his comment the assistant District Attorney referred to a case where counsel (neither of those appearing here), who had examined the witness had pursued the same tactics in another case which he claimed were successful. We think this was improper, but this statement was not objected to. Aside from this the leading counsel for defendant, without objections, made a statement to the jury to the effect, that he had talked with the attorney who had examined the witness and was authorized by him to say that the statement of the assistant District Attorney respecting the outside incident was false and without foundation, that he had not requested the witness to shake hands with the defendant, and that this act, so far as he knew, was voluntary on the part of the witness.

Much space in the brief for defendant is devoted to excerpts from the closing argument of the District Attorney, which it is claimed were unwarranted and prejudicial to the defendant, that can be considered without stating them in full, after first giving a synopsis of the salient testimony in the case, and the theory of the respective parties upon which the case was tried.

Von Phul was shot by defendant in the barroom of the Brown Palace hotel. It was shots intended for Von Phul that struck and killed Copeland, and the case was tried by the prosecution upon the theory that defendant was guilty of murder in taking the life of Von Phul, and therefore, guilty of murder in killing Copeland. The defense was self-defense, while on the part of the prosecution it was claimed the defendant purposely provoked a difficulty with Von Phul in order to have a pretext to take his life, actuated by jealousy of Von Phul. The prosecution claimed, and introduced testimony to establish that defendant and Von Phul were rivals for the favors of the woman in the case; that the relations of defendant with this woman were improper, and that similar relations had previously existed between Von Phul and the woman; that Von Phul had recently ar-

rived from St. Louis and had been paying the woman attention. There was also testimony on the part of the people to the effect that the alleged improper relations of the woman and defendant commenced while defendant was a guest at the home of the husband of the woman, and that defendant was endeavoring to interest the husband in an enterprise which he was promoting, for which he required capital. The defendant and Von Phul had a quarrel in the room of the latter the day preceding the homicides. Regarding this quarrel the defendant testified that he had been commissioned by the woman to secure letters she had written Von Phul; that he went to his room for that purpose; that Von Phul struck him on the head with a shoe tree, and drew a revolver saying he would kill him if he were armed, and that after this quarrel and on the day preceding the homicides, he purchased the revolver with which the homicides were committed to defend himself, as he had been informed subsequent to the quarrel that Von Phul had threatened to kill him. Further evidence on the part of the people was to the effect that after the first difficulty with Von Phul the defendant went to the chief of police and tried to induce him to have Von Phul driven out of the city, at the same time stating that if Von Phul sent the letters mentioned, to the husband of the woman, he, the defendant would kill him; that on the evening of the homicides he went into the dining room of the Brown Palace at the dinner hour, but refused to take a seat at the table indicated by the waiter. Later when Von Phul and a party of friends were seated at a table, defendant took the seat he had refused which was next to the table occupied by Von Phul and his friends, and during dinner made offensive and sneering remarks, apparently directed at Von Phul, and of a character calculated to bring about a quarrel. One of the parties at the table with Von Phul testified that the conduct of defendant was so offensive that the witness volunteered to assault him, but was restrained by Von Phul, who told him to pay no attention to the matter.

The testimony on the part of the prosecution bearing on the shooting is substantially as follows: Several persons, including Von Phul, Copeland, and the defendant, were in the barroom of the Brown Palace hotel several hours after what occurred in the dining room. Some twenty or thirty persons were present. The defendant and others with him, at his invitation, were about to take a drink at the bar, while Von Phul and another party were standing at the bar for the same purpose. After ordering the drinks the defendant left his place at the bar and went over to Von Phul and touched him on the shoulder. Von Phul turned around, and after the exchange of a few words struck the defendant with his fist, and knocked him down with considerable force, and immediately turned to the bar, standing with his back to the defendant with his right arm resting on the bar; that he did not attempt to pursue the defendant or draw a revolver, or make any demonstration towards him; that defendant raised from the floor and attempted to draw his revolver; that two men seized and tried to prevent him from shooting; that he pushed them aside, and commenced shooting at Von Phul; that during this time the latter did not advance on defendant or make any hostile demonstration whatever, and that as soon as the first shot was fired Von Phul started to walk out of the barroom, but that defendant followed him up and kept on shooting and pulling the trigger after the shots had all been fired. Two of the shots struck Von Phul in the back, and one his right wrist. The testimony discloses that at the time of the shooting Von Phul was unarmed. A number of witnesses testified that after knocking the defendant down Von Phul paid no further attention to him, but turned away and resumed conversation with his friends. There was also testimony introduced on the part of the people to the effect, that shortly before the shooting the defendant advised a friend of his to "stick around" the barroom as there was likely to be "something doing."

The defendants' version of the affray as disclosed by his testimony was substantially as follows: That he entered the barroom and invited parties who had attended the Broadway Theatre with him to have a drink; that Von Phul was standing at the bar; that Von Phul changed his place and took a position nearer him; that Von Phul was making remarks which he could not hear, but were apparently directed at him; that the expression on Von Phul's face was one of hatred; that his actions led him to believe trouble was coming; that he thought it best to say something to Von Phul; that he went over to him and asked him if he would not reconsider what had been said and the threats he said he was going to carry out the day before; that Von Phul replied, "He was going up and grab the old gray headed (using an epithet) and pull him out of the room and tell him he was master there. I am going to get all three of them, I am going to get you first"; that these remarks were followed by a blow, which felled him to the floor with such force as to daze him; that he arose quickly and drew his revolver and commenced shooting at Von Phul, who stood facing him with his right hand on his hip pocket.

It appears from the testimony that after these occurrences the husband of the woman brought a suit against her for divorce. It also appears that previous to the affray Von Phul had torn the picture of the defendant, which the woman had in her possession.

Whatever is fairly deducible from the testimony comes within the legitimate sphere of argument to the jury. The argument of the District Attorney to the effect that defendant shot Von Phul in the back is of this nature. According to the testimony two of the shots struck him in that part of his body. The District Attorney said this coward, (the defendant) sneaked up behind Von Phul and shot him in the back. The testimony for the people was to the effect that Von Phul was standing at the bar with his back to the defendant, and paying no attention to him whatever when he commenced shoot-

ing. Of course it must be understood that in commenting on the testimony, we are not stating what is true or untrue, but merely referring to such portions thereof as would justify assertions of the District Attorney in his argument, it being the province of the jury to pass upon the credibility of such testimony, so that over assertions, if any, as to what it might establish, would certainly not influence the jury in determining what facts it did establish.

The District Attorney also said in substance that when the defendant shot Von Phul in the back, without justification, and with premeditation, deliberation, and malice aforethought, and one of the bullets struck an innocent bystander and caused his death, he was guilty of murder of the first degree. This line of argument was not unwarranted. The contention on the part of the people was, that defendant was guilty of murder in taking the life of Von Phul, and therefore, unintentionally killing Copeland, by bullets intended for Von Phul, was also murder. There was testimony to establish this contention. All through the case the people insisted that one of the motives which actuated the defendant to shoot Von Phul was jealousy, and it was in no sense improper to argue to the jury any and all matters which tended to establish that improper relations existed between the woman and the defendant, and the fear Von Phul would supplant him, and what would be the result upon him if that occurred, which bore upon the question of motive.

The picture incident was also referred to, but only by way of an assertion that it would not be a justification for shooting Von Phul.

Referring to the plea of self-defense the District Attorney in effect said, that if the danger to be apprehended from Von Phul was not so urgent as to require the defendant to shoot, there was no self-defense in the case; and referring to the court's instructions stated, that the words "great bodily harm" meant something more than a slight injury, and that it meant a serious and severe injury. Commenting further, it was stated

that the court had said that assault and battery from which only slight injury was liable to come was not great bodily harm, and therefore, there was nothing upon which to base the plea of self-defense. The purpose of this argument was to show that the shooting, as disclosed by the evidence and under the instructions of the court, was not justified. This was legitimate, and while the statement of the District Attorney may not have been strictly accurate, it was in no sense misleading.

The District Attorney also made a strong appeal to the jury to return a verdict of murder in the first degree and fix the penalty at death, and urged that if men like the defendant could go out and wreck homes and shoot men in the back, and shoot into a crowd, and then be turned loose, there would be no safety in the community for law abiding citizens, and that there would be no necessity for courts or juries, unless examples were made of cold blooded murder. It must be conceded that the appeal was strong, but there was testimony to establish that defendant was guilty of murder, and appealing to the jury to do their duty as the law provides, and why they should discharge their duty, was a proper matter for the District Attorney to urge upon their attention.

Other remarks were made by the District Attorney, to which objections were interposed and promptly sustained, and the jury advised by the court to disregard them. Clearly such remarks did not prejudice the defendant. Some were made to which objections were not interposed at the time in the way of reference to the defendant that were uncalled for. Trial courts should promptly stop remarks which are simply abusive of a defendant. However, counsel for defendant were vigilant at every stage of the case in protecting his rights. The trial court at their request had several times admonished the District Attorney, and advised the jury to disregard statements to which objections had been made, so that it is evident the jury understood that statements which had no bearing on the case as made by the testi-

mony were not to be regarded by them, and for these reasons we are satisfied the defendant was not prejudiced by the remarks under consideration.

During his argument the District Attorney referred to the change in the testimony of a witness for the defendant, to which we have referred, so that it read "right hand" instead of "right arm." The circumstances under which the change was made have already been noted. The District Attorney characterized the change as a forgery. This statement was not justified, and counsel for defendant objected to it. The court very properly said that alteration would be better than forgery, and advised the jury to disregard the charge of 'forgery against counsel. The only question was whether right arm or right hand was correct. From all the circumstances the jury understood that was the issue, and unwarranted assertions by the District Attorney could not cause them to overlook the real question involved. As was aptly said in *The State v. Gulliver*, 142 N. W. 947, decided by the Supreme Court of Iowa: "Jurors must be supposed to have some capacity to distinguish between the fury and fustian of partisan oratory and the rational analysis of testimony."

The coat worn by Von Phul when shot was in evidence. It was claimed that a bullet hole in the coat corroborated the testimony tending to establish that defendant shot in self-defense. It appears that one of the attorneys for the defendant had had the coat in his possession, but always in the presence of others. The District Attorney in his argument exhibited the coat to the jury, and claimed that the hole was not made by a bullet, but was a knife cut, and also intimated that counsel for defendant might or could have made the cut. The coat was before the jury, and they could determine from the appearance of the hole how it was made. Its appearance was proper to comment upon, and it was not outside of the record to call attention to how it might have been made. The District Attorney also referred to the incident of a witness shaking hands with the de-

fendant.  We have already considered that matter.  In
referring to counsel who examined that witness, the
District Attorney said, "I wonder if he thinks that this
is another Gertrude Patterson jury?"  Counsel for de-
fendant objected to this statement.  The court promptly
sustained this objection, and the District Attorney said,
"I withdraw it."

This concludes a review of the questions based on
the alleged misconduct of the District Attorney, and we
are satisfied from the record that defendant was not
prejudiced by the action of counsel representing the peo-
ple.  He was represented by able and vigilant counsel,
who never overlooked an opportunity to protect his
rights.  The court admonished the jury several times not
to consider matters to which objections were made and
sustained.  The court instructed them, as we have above
noted, that in determining the facts they were to con-
sider only the evidence given at the trial, and that the
opening statements and arguments of counsel were not
evidence.  From these authoritative sources the jury un-
derstood that in determining the guilt or innocence of de-
fendant the testimony alone was to be considered.

Errors are assigned upon instructions given which
relate to the plea of self-defense.  The objection urged
is that thereby the burden of proof was cast upon the
defendant to prove his innocence.  They are not sus-
ceptible of this construction.  They stated the circum-
stances under which self-defense was available, and
when a defendant under the law would be justified in
taking the life of a human being, in accordance with the
law as oft times declared by this court.  But it is urged
that the instructions embody the common law doctrine
"of retreat to the wall," which has been modified in this
jurisdiction.  We do not so read them.  The cases to
which counsel refer on the subject considered instruc-
tions which stated in substance that to justify homicide
under the plea of self-defense, it must appear there was
no other way for the defendant to save his life, or save
himself from great bodily harm, except to take the life of

his assailant. The instructions in the case at bar do not so declare the law, but do announce in accordance with the previous decisions of this court, in what circumstances, as applicable to the testimony in this case, a defendant may lawfully take a human life in order to save his own, or prevent great bodily injury to himself, and do not intimate that he must retreat, if by that course he could save his life, or save himself from great bodily harm without shooting his assailant. It is also claimed the instructions are erroneous because they say in effect that it must have appeared to the defendant, and the circumstances must have been such that it would have appeared to a reasonable person similarly situated that the danger was so urgent, imminent, and impending, and not prospective, not even present in the near future, that it was absolutely necessary for him to kill Von Phul in order to save his own life, or prevent his receiving great bodily harm, (1) because by the use of the word "absolutely" it meant the danger must have been actual; (2) that thereby the jury were advised that a weapon must have been actually drawn and directed against the defendant before he would be justified in shooting; (3) because defendant was justified in acting upon the circumstances as they appeared to him. The use of the word absolutely is the language of the statute, section 1634, Revised Statutes 1908. The instructions do not in any manner convey the idea that the defendant was not justified in shooting unless Von Phul had actually drawn a weapon, but submit to the jury to determine whether from all the circumstances, in accordance with the law, the defendant was justified in shooting Von Phul. It is true in a general way that a defendant, in using a weapon to defend himself is entitled to act on appearances, but they must be such, taking into consideration the circumstances and his surrounding at the particular instant of time, as would lead a reasonable and prudent man to use a weapon under like circumstances for protection.

It is also contended that by an instruction the court

invaded the province of the jury by practically directing a verdict of murder in the first degree. There is no foundation for this contention.

Error is also assigned on instructions requested and refused. The first of these requests was fully covered by the instructions given. With respect to the others we think it is sufficient to say that counsel do not cite any authorities to support them, neither do they cite any cases holding that the instruction of the court on the same subject is not correct.

It is next urged that the testimony is insufficient to sustain a verdict of murder in the first degree, and not sufficient to support any verdict of guilty higher than voluntary manslaughter. There was testimony to establish all the facts and elements necessary to constitute murder in the first degree, and while there was testimony from which the jury might have found a different verdict, it was their exclusive province to determine from the testimony his guilt or innocence and the degree of the offense for which the defendant was on trial, if guilty, and hence it is beyond the authority of this court, from a review of the record, to say the verdict should have been different when there is sufficient testimony to sustain the one returned.

The final question urged is that the verdict is excessive. It is true, when the case was here before the judgment was reversed because the court instructed the jury "That there is no manslaughter in this case." We held this prejudical error for the reason there was testimony tending to establish manslaughter, and that its credibility and force were for the jury to consider in determining the facts, and not a matter of law for the decision of the court, and therefore, by the instruction given, they were deprived of their exclusive province to determine the grade of the offense. We said however, that, "We did not mean to intimate what the verdict should have been, but as there was not an entire absence of evidence tending to establish the crime of manslaughter it was error for the court to take that question from

the jury by instructing them, 'That there is no manslaughter in this case.' " Of course a verdict should not be approved by the trial court or this court on review, if the evidence is insufficient to establish it, but when, as we have said, the evidence is sufficient to establish the facts and elements of the crime of which a defendant is found guilty, it cannot be disturbed merely because a verdict for a less degree of the offense might have been returned.

It is claimed the trial court did not approve the verdict because after denying the motion in arrest of judgment he said, "The court has no discretion in fixing the penalty for murder in the first degree; that is a matter solely for the jury. My mind assents to the justness and righteousness of the verdict of murder in the first degree in this case, and I believe that the defendant should suffer the highest penalty known to the law, except the penalty of death. I believe that the death penalty should be inflicted only in the most extreme cases, as where a person commits murder while committing, or attempting to commit rape, robbery, burglary, arson, and the like, or where poison is administered, or where a person lies in wait and shoots down his enemy, and in other cases of a similar character. The facts here, in my opinion, take this case out of that class, and I therefore recommend that the governor commute this sentence to imprisonment at hard labor for life." It thus appears that the trial judge did fully approve of the verdict in finding defendant guilty of murder in the first degree. What he said regarding the penalty fixed by the verdict was merely an expression of his personal views as to the character of cases in which the death penalty should be imposed, and in no sense indicated or intimated that the evidence was insufficient to support the verdict. The law provides, section 1624, Revised Statutes 1908, after defining what shall constitute murder in the first degree, that, "The jury before which any person indicted for murder shall be tried, shall, if it finds such person guilty thereof, designate by its verdict

whether it be murder of the first or second degree, and if murder of the first degree, the jury shall in its verdict fix the penalty to be suffered by the person so convicted, either at imprisonment for life at hard labor in the penitentiary, or at death; and the court shall thereupon give sentence accordingly." From these provisions it appears that the particular manner in which a murder is committed does not govern the penalty when a verdict in the first degree is returned, but the penalty to be imposed is a matter solely for the jury to fix, either at imprisonment at hard labor for life, or death.

The evidence on behalf of the prosecution was to the effect that defendant had had a serious quarrel with Von Phul the day preceding the homicides; that subsequently he purchased a revolver; that he attempted to have the police drive Von Phul out of the city; that a few hours previous to the shooting he had endeavored to provoke a quarrel with Von Phul; that he approached the latter in the barroom; that when he was knocked down, he arose and attempted to draw his pistol; that he was seized by two men who endeavored to prevent him shooting; that he threw them aside; that Von Phul after knocking him down did not attempt to pursue him, draw a weapon, or make any hostile demonstration whatever; that when defendant commenced to shoot, Von Phul was standing with his back towards him; that Von Phul was shot in the back; that when defendant commenced to shoot, Von Phul retreated; that the defendant followed him up, and continued shooting until all the shots were fired, and still continued to snap his revolver; that the shooting occurred in a room where many bystanders were present, and that Copeland was struck by bullets intended to strike Von Phul. There was also testimony from which it could be inferred that the defendant was jealous of Von Phul. We think this testimony is sufficient to establish all the facts and elements necessary to constitute murder in the first degree.

The judgment of the District Court is affirmed.

It is further ordered that the judgment of the Dis-

trict Court be executed during the week commencing October 25, 1914.

*Judgment affirmed.*

Decision *en banc.*

Chief Justice Musser, Mr. Justice Garrigues, Mr. Justice Scott, and Mr. Justice Bailey concurring.

Mr. Justice Hill not participating.

Mr. Justice White dissents.